MARION J. BALLARD, Appellee, v. A. N. MILLER, Administrator, Appellant.

No. 39926.

FEBRUARY 11, 1930.

REHEARING DENIED SEPTEMBER 27, 1930.

*Tinley, Mitchell, Ross & Mitchell* and *Lloyd W. Fallon,* for appellant.

*William P. Welch* and *Robertson & ,Wolfe,* for appellee.

EVANS, J.—I.   The defendant is the administrator of the estate of Emma Pfrommer, who died intestate July 5, 1928.   In her lifetime she had owned and occupied a farm of 120 acres for many years, and up to a few months before her death.   In March, 1928, she was taken from her home to the insane asylum at Clarinda, where she later died.   She was at all times a single woman, and left surviving her collateral heirs only.   The plaintiff was her second cousin, and worked for her for many years (not continuously) during the period from 1900 to the date of her death. Her farm was operated in part by herself and in part by renters. For some years the plaintiff was a renter of a part thereof, and for some years he worked for her upon the farm.   About December 10, 1920, she met with a severe accident, wherein she was severely burned about her head and face and hands, and whereby she became bedridden for a time, and became more or less disabled for all time.   The last period of service rendered to her by the plaintiff began immediately after this accident.   This service continued up to the time of her death. One count of plaintiff's claim is predicated upon this service.   The other count is predicated upon services alleged to have been rendered from 1900 to 1920, under one contract.   For some reason not apparent, the plaintiff has predicated Count 1 upon his later service, and Count 2 upon his earlier service.   The case upon both counts can be considered more conveniently if we observe the actual chronology of events.   We shall consider first, therefore, the claim predicated upon the earlier service, which is denominated by the plaintiff Count 2.

The plaintiff averred in his pleading that, in March, 1900, he entered the service of the deceased under a contract whereby she was to pay him *at the time of her death* the reasonable value

of his services.   He averred that the reasonable value of his services was $50 per month for 20 years, and he claimed a total of $12,000, which claim he asked to have established against the estate.   In this count the plaintiff purported to set forth a single cause of action, as upon an open and continu-

ous account, extending from March, 1900, to December, 1920. We note, also, the particular averment that the payment of the services was to be made after the death of the decedent. The function of this averment was to avoid the statute of limitations. The court instructed the jury that this averment must be proved, in order to allow the plaintiff any recovery on such count. The case appears to have been tried on the theory that this averment rendered the pleading unassailable on the ground of the statute of limitations. The infirmity of plaintiff's proof of this count, as urged by the appellant, is the failure of his proof in the following respect: That he did not prove that payment for his services was to be deferred until the death of his employer, and that the service rendered by him was not a single and continuous service, but that such service was rendered at intervals, separated by several intervening years.

It appears that the plaintiff entered the service of the decedent in March, 1900, and worked for her continuously for seven years, at the end of which time he quit the service. He testified that he entered her service again in the fall of 1910, and continued for three years. It appears conclusively, however, from one of his own letters, introduced in evidence by the defendant, that he was otherwise engaged at North English, Iowa, in that year. He conceded the authorship of the letter, but offered no explanation thereof. Nor did he offer any other evidence as to his whereabouts in the 3-year period beginning in 1910. If we accept his statement that he worked there in 1912 and 1913, yet it appears from his own evidence that he left in the fall of 1913, and that he was again employed in the fall of 1916, and remained until the fall of 1918. He was not in the county in the year 1919 or 1920 until December 12th of the latter year. The evidence discloses, therefore, three distinct periods of service, far separated in point of time. During the years 1917 and 1918, he was a renter of a part of the farm, conducting his operations with the stock and tools of the decedent. He received a share of the crop, as such renter. The evidence relied on in proof of the contract under which the service was rendered, was the testimony of the witness Hillyard. It was as follows:

"I did hear some talk between her and him about work. I heard her tell him [in 1900] she was going to pay him well for

his work. She wanted him to stay with her right along. When she told him that, he said, 'All right,' he would stay. * * *

"Q. Now, Mr. Hillyard, have you had different conversations with Emma Pfrommer after M. Ballard commenced to work there and before he went away, in 1918 or 1919, about the work and whether she was going to pay him for it or not? A. Yes, sir. Q. And did you hear her make statements about that matter repeatedly during that time? A. Yes, sir. Q. You may tell the jury what you heard her say, in Mr. Ballard's presence, about going to pay him well for the work he did for her from 1900 to 1920. A. Yes, she told me she was going to pay Mr. Ballard well for staying with her and helping her. Q. And at that first time, now, that you heard the talk between them, when he came there to work, what did she say as to when she was going to pay him? A. She said she was going to pay him when she was through with him. Q. At that time, she used the words 'pay him when she was through with the property?' A. Yes, sir. Q. And later on, did you hear her make statements how she was going to pay? A. Yes, sir. Q. What did she say later on, at different times? A. She told me she was going to give him the home 40 and the personal property. Q. That was after she was burned? A. Yes, sir. Q. I am not asking you about that,—did you hear her make statements before 1919, before she got burned, as to how she was going to pay him, and out of what property? A. She said she was going to pay him out of her property when she was through with it, and would pay him well."

The foregoing is all the testimony in the record purporting to state the original contract, in March, 1900. Some evidence was introduced of statements made by the deceased many years later as to what she intended to do. Unless the foregoing, however, is sufficient to go to the jury as proof that, under the original contract between the parties, payment for the service was to be deferred until the death of the decedent, then such averment was not proved. We think such evidence is clearly insufficient for such purpose. This conclusion is strongly fortified by a perusal of the letters of the plaintiff, written by him to the deceased from different localities. After his first seven years' service, he lived in Oklahoma for two or three years.

Sometime in 1913 or 1914, he bought land in Iowa County. In January, 1915, he wrote to the deceased as follows:

"I am going to farm next summer and I am going to live on the place I bought. I have only five acres of land now. Now I lost fifteen acres of land buy staying out at your plaise so long last fall. But I got to keep the five acres that had the house on and I am going to live there and keep batchlarhall. I wish you was hear to live with me."

In October, 1915, he wrote to the deceased as follows:

"Well Emma I dont know hardly how to answer your letter as I had to wait so long on getting an answer from you. I have promised Cheney to farm his land another year but I think he will let me off if I can make a deal with you. Now Emma just as soon as this letter comes to hand write and let me know how you want to wrent your farm next year. I wanted to go out to your plase this fall but I had so much work to do I couldent get away and it will soon be corn husking time so I cant come now but if we make a deal I think I can come out to your plase about Christmas. Now Emma answer this letter soon as it comes to hand and let me know how you want to rent your farm next year. From your cousin."

In November, 1911, he wrote:

"How is your health you didn't say anything about yourself are you going to stay on the farm who have you got doing your work. Well Emma if you want to stay on the farm let me know and I will fix so I can farm the plase for you that is if you will promise to keep Jones from the place and not allow him to stay on the place at all."

In August, 1915, he wrote from Iowa County the following letter:

"I rote you some time ago and dident hear from you so I will rite once more we are all well at present hope this letter will find you the same. Well Emma I thought I would write you in regard to wheather you was going to rent me your farm next year as I would like to know for the fellow I am renting of this year wants to know if I will farm his land another year but I

cant promise him untill I hear from you as you know you said when I was at your plaise last fall you said you would rent me your farm after this year so I cant rent a plase untill I hear from you. Now Emma write and let me know soon as this letter comes to hand so I will know what to do. If you will rent me your farm I will come out to your plaise some time this fall and stay with you this winter. Now Emma answer this letter buy retain mail.''

Receipts signed. by him show that he did rent the farm in the years 1917 and 1918. His many letters put in evidence are uniformly inconsistent with any idea that there existed any unsettled matters between him and the deceased prior to 1920.

It is our opinion that, upon the record before us, it must be said that the service rendered by the plaintiff, including the occupancy of her land in 1917 and 1918, was not a single and continuous service; that his first service ceased with the expiration of seven years, after which he lived for two or three years in the state of Oklahoma; that the alleged proviso for payment of his services after the death of the decedent was not proved.

Inasmuch as the court instructed that no recovery could be had upon this count unless the allegation was proved as pleaded, we need not consider the question of the statute of limitations. The verdict of the jury allowed the plaintiff to recover on this count the sum of $1,025. That finding by the jury was not warranted, and should have been set aside.

II. We come now to the final period of service, which began December 12, 1920, and upon which plaintiff's Count 1 is predicated. This is a claim for damages for alleged breach of a contract. The alleged agreement of the decedent, as pleaded, was:

''That in consideration of all of said services to be rendered by this claimant for her as above stated, said Emma Pfrommer orally agreed and promised that upon her death she would pay this claimant for all of said services by giving, *deeding or willing* to him the homestead 40 acres of said premises, free and clear of all encumbrances,'' etc.

A similar agreement was pleaded as to the personal property.

The breach of contract charged by the plaintiff is that the decedent failed to make conveyance of the property, either by deed or by will, and that by such failure he was damaged to the extent of the value of the property. The verdict  of the jury allowed him $3,485 as the value of the homestead 40, and $1,332.50 as the value of the personal estate. Such verdict was sustained by the judgment. One ground of attack upon it is the insufficiency of the evidence to show any breach of the contract. This attack involves a mixed question of law and fact. It appears that, on the 10th day of December, 1920, the decedent was severely burned, through an explosion of kerosene. One of the neighbors, at her request, wrote a letter to the plaintiff, advising him what had happened, and requesting him to come at once to her home. He arrived there on the 12th of December. The neighbor (Archie Hillyard) who did the writing testified to the oral contract had upon the arrival of plaintiff, as follows:

"I was there after Mr. Ballard arrived. She said, if Jet would come back and stay with her until her death, and take care of her and the farm, and work for her, she would give him the homestead 40 and the personal property at her death, outside of the one third of the crop that he was to receive for farming the land. He said he would agree to do that, and stay there with her as long as she lived, and take care of her."

This evidence was corroborated by other testimony. There is no claim that she ever repudiated this contract or conversation. On the contrary, the testimony of the plaintiff shows that she at all times confirmed it. The question naturally arises, What constituted a breach of the contract upon which plaintiff predicates a claim for damages? The theory of the plaintiff is that she breached the contract by failing to make a will, or by failing to make a conveyance. She never in terms agreed to make a will or to make a formal conveyance. Nor did the plaintiff ever demand or request such a performance on her part. The contention of the appellant at this point is: That no *breach* was shown; that, if the truth of plaintiff's testimony be assumed, he bargained orally, and not otherwise; that the title thus acquired by him was oral and equitable; that it was not invalid on such

account; that it was peculiarly of equitable cognizance; that the plaintiff's remedy was a suit in equity, to establish and confirm such equitable title; that such decree would become perpetual evidence thereof; that the decedent never repudiated the alleged contract, and never did any act derogatory to the plaintiff's equitable right; that, therefore, the plaintiff had no right to elect to sue for damages; that, on the contrary, his sole remedy was in equity. The nature of plaintiff's equitable title under his oral contract, as claimed by appellant, is defined in 5 Pomeroy's Equity Jurisprudence (4th Ed.), Section 2168, as follows:

"A contract to devise land, though looked upon with some disfavor as a non-testamentary method of disposition of property at death, and consequently not subject to the statute of wills, will yet be, in effect, enforced by equity when the contract is clear, definite, and without doubt. It is obvious that equity cannot compel direct specific performance of the contract to devise land by ordering the promisor to make the devise before his death, as performance is not due until the time of death. But equity will do what is equivalent to giving specific performance, by fastening a trust upon the land, in the heir or devisee, and enforcing conveyance by the representative holding the legal title in favor of the purchaser under the contract to devise. Before the death of the promisor, equity will enjoin any attempted conveyance of the land to a third party, as a fraud upon the promise of the contract to devise; or, if it has been conveyed to a grantee with notice or without consideration, equity will compel the land either to be held in trust for the devisee-purchaser, or to be reconveyed to the grantor. Equity will construe the contract to devise strictly against the complainant, so as not to interfere with freedom of testamentary disposition. It is said, referring to a *parol* contract to devise, 'In cases of this sort it will not satisfy the requirements of the law to show that there was an understanding of an indefinite character, leaving its terms more or less to inference.' "

We recognize the force of appellant's contention at this point, and some of us are disposed to its adoption. The majority view, however, is that the undertaking of the decedent to "give" this land to the plaintiff implied some degree of formality in its performance, and implied an undertaking to furnish him with

such evidence of his title as would be legally admissible in his favor and as against her estate after her decease; and that, though the decedent never intentionally repudiated her contract, nor consciously perpetrated any breach thereof, yet her failure to clothe the plaintiff with some muniment of title, either by will or otherwise, was a constructive breach of the contract. The force of this contention is also quite self-evident. It must be said, also, that the appellant suffered no prejudice at this point. His argument is that the plaintiff, by bringing his action at law, was enabled to prove his cause by mere preponderance of the evidence; whereas, in an equity suit, he would have been required to establish his claim by clear and satisfactory evidence. We think the plaintiff made a clear case at this point, and that the evidence in this record would fully satisfy the call of a court of equity on the issue as to whether such a contract was made. The origin of this contract had a very different setting from that of 1900. Here the circumstances were dire, the call upon the plaintiff was urgent, his arrival was prompt. He became a necessity to the situation. His performance was faithful and wholehearted, and was at all times appreciated by the decedent. Her expressions of approval of his performance were uniform. We are well persuaded, therefore, that, upon this record, a court of equity would have confirmed the equitable title. The plaintiff offers to accept the title to the land, in lieu of the item of damages allowed therefor. No prejudice, therefore, was suffered by the appellant at this point.

. III. It remains to consider the item of $1,332.50 allowed by the verdict as the value of the personal estate. Plaintiff's alleged acquisition of the personal estate rests upon the same  testimony as did his equitable title to the realty. The legal effect of the evidence, as applied to the personal property, is not necessarily the same. No specific personal property then in existence was contemplated by the contract. There was not in existence at that time any personal property to which the contract could be applied in advance of the death of the decedent. Plaintiff's right to any particular property could arise only by and after the death of the donor. The contention of the appellant at this point is that the construction of the contract most favorable to plaintiff gave him no present

right in any particular property; that, at best, it was the equivalent of a contract to make a will, devising to the plaintiff decedent's personal estate; that if, in fact, she had made such will, the plaintiff could take thereunder only the residue of the personal estate after the payment of debts; that he could not take thereunder the personal property in gross; that the measure of his damages in the present action cannot lawfully exceed the amount which he would have received if a will had been made; that this item as allowed by the jury was, therefore, excessive, in that it comprised the gross value of all the personal property coming into the hands of the administrator, regardless of debts. Here again, some of us are disposed to sustain this contention. However, the view of the majority is that the oral contract should be construed to cover the gross personal property in kind, as of the death of the decedent. Under this view, the damages as to this item were properly measured, under the instructions of the district court. The foregoing comprises the larger merits of the controversy and the principal points presented for our consideration.

If the plaintiff will file herein a remittitur of the item of $1,025 included in the verdict, the judgment below will be otherwise affirmed. If no remittitur be thus filed, the judgment will be reversed as to such item, and cause remanded.—*Affirmed on condition; otherwise, reversed in part.*

Morling, C. J., and Faville, Albert, Kindig, and Grimm, JJ., concur.